**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

------------------------------------------------------------x
                                       :

In re:                               :    Chapter 11

                                   :

THE WET SEAL, LLC, *et al.*,         :    Case No. 17-10229 (CSS)

                                   :

       Debtors.[1]                   :    (Joint Administration Requested)

                                   :

------------------------------------------------------------x

**DECLARATION OF JUDD P. TIRNAUER IN SUPPORT OF**
**CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Judd P. Tirnauer, do hereby declare, under penalty of perjury, the following to the best of my knowledge and belief:

1.        I am the Executive Vice President and Chief Financial Officer for The Wet Seal, LLC, a single member Delaware limited liability company ("Wet Seal"). I also serve as the Chief Financial Officer for Wet Seal's affiliate, The Wet Seal Gift Card, LLC ("WSGC"), a single member Virginia limited liability company, and Wet Seal and WSGC's sole member, Mador Financing, LLC ("Mador Financing"), a Delaware limited liability company (collectively with Wet Seal and WSGC, the "Debtors"). Mador Financing is the manager of Wet Seal and WSGC, and non-debtor Mador Holdings, LLC is the sole member and manager of Mador Financing. A copy of the organizational chart that includes all three Debtors and their non-debtor parent is attached hereto as Exhibit A.

2.        I am familiar with the day-to-day operations and business and financial affairs of the Debtors, having served in my current capacity since May 1, 2016.

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: The Wet Seal, LLC (2741); The Wet Seal Gift Card, LLC (3286); Mador Financing, LLC (1377). The Debtors' corporate headquarters is located at 7555 Irvine Center Drive, Irvine, California 92618.

3.      I have over twenty years of experience in corporate finance and accounting, having served in numerous senior level positions with several private and public retail companies.  Prior to joining the Debtors, I served as Executive Vice President and Chief Financial Officer of Destination Maternity for approximately five years, following three years as Senior Vice President and Chief Financial Officer.  I began my career with Arthur Andersen, where I worked in the tax department and later practiced with the Economic and Financial Consulting Department.  I am a Certified Public Accountant, and I received a Masters of Business Administration and a Juris Doctorate from Widener University.

4.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief with the United States Bankruptcy Court for the District of Delaware (the "Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing these chapter 11 cases (collectively, the "Chapter 11 Cases").  The Debtors intend to operate their business and manage their properties as debtors in possession while they wind down their operations and implement an orderly liquidation strategy that was commenced prior to the Petition Date, primarily through going-out-of-business sales at the Debtors' retail locations (the "Store Closing Sales") and corresponding discounts offered on the Debtors' website.

5.      This declaration (this "Declaration") is submitted (i) to provide an overview of the Debtors and these Chapter 11 Cases and (ii) in support of the Debtors' chapter 11 petitions and "first day" motions (each a "First Day Motion," and collectively, the "First Day Motions"), which have been filed to minimize the adverse effects of filing for chapter 11 protection and enhance the Debtors' ability to maximize the value of their estates through the Store Closing Sales and other disposition efforts.

6.      If called as a witness, I could and would competently testify to the matters set forth herein based on my personal knowledge.  In my capacity with the Debtors, I have become familiar with the Debtors' day-to-day operations, business affairs, financial condition and books and records.  My testimony herein is based on my service as an officer of the Debtors, my review of the Debtors' books and records and other relevant documents, and my review of information compiled and communicated to me by other employees of the Debtors and the Debtors' professional advisors.

7.      Prior to the commencement of these Chapter 11 Cases I, inter alia, (i) reviewed and discussed the Debtors' strategy regarding the development of potential restructuring alternatives and, ultimately, implementation of the wind-down process described herein; (ii) supervised the preparation of the documentation needed to implement the orderly liquidation contemplated during these Chapter 11 Cases; and (iii) consulted on a regular basis with the Debtors' other senior management members and outside advisors with respect to the foregoing.

8.      Section I of this Declaration summarizes the Debtors' exhaustive prepetition attempts to right-size the Debtors' operational structure, streamline the Debtors' retail footprint, and raise capital to give the Debtors sufficient runway to attain profitability, and sets forth an overview of the Debtors' chapter 11 objectives and the benefits thereof. Section II describes the Debtors' business history, corporate structure, governance model and prepetition indebtedness.  Section III describes the events and circumstances that triggered the commencement of these Chapter 11 Cases.  Section IV further details the Debtors' objectives for these Chapter 11 Cases and the contemplated means by which such objectives will be met.

Finally, Section V sets forth the relevant facts in support of the First Day Motions and summarizes the relief requested thereby.

## I.    Summary and Overview

9.    The Debtors are a national multi-channel specialty retailer selling fashion apparel and accessory items designed for female customers aged 18 to 24 years old.  The Debtors are currently comprised of two primary units: the retail store business and an e-commerce business.  Through their retail store business, the Debtors operate approximately 142 retail locations in 37 states, principally in leased-based mall locations.[2]  Through their e-commerce business, the Debtors operate an e-commerce site at www.wetseal.com and have over 2 million followers on their Facebook page.  The Debtors also have historically sold gift cards, which business has been primarily operated through WSGC.

10.    The Debtors enter these Chapter 11 Cases having exhausted their prepetition restructuring options and commenced the Store Closing Sales once it became apparent that further financing to operate as a going concern was not available.  After attempts to develop going concern restructuring options proved unsuccessful, the Debtors determined, upon consultation with their key constituents, that the Store Closing Sales and these subsequent Chapter 11 Cases provided the best opportunity to maximize value for the Debtors' estates, creditors and all interested parties.  This decision was reached only upon considering all available reasonable alternatives, exploring and entertaining creative restructuring solutions, and pursuing both strategic and operational business partners.  In conjunction therewith, after having exhausted all such alternatives and options, Mador Holdings, LLC, acting in its capacity as the

---

[2]    During January 2017, the Debtors terminated operations at 37 retail locations, including pop-up stores. Prior to those closures, the Debtors operated 179 stores in 40 states as of January 1, 2017.

sole manager of Mador Financing, issued its written consent on January 20, 2017, thereby

authorizing the Debtors to commence the Store Closing Sales.

11.    As noted above and further detailed below, the Debtors have struggled to

overcome financial and operational challenges, including those that existed before the Debtors'

acquired the *Wet Seal* business operations approximately twenty-one months ago.  While they

have corrected many operational inefficiencies and implemented brand enhancement efforts

since being acquired out of bankruptcy in 2015, the Debtors have unfortunately—and

consistently—incurred operational losses stemming from, among other things, onerous lease

obligations, underperforming retail locations, and increased competition in the teen fashion retail

industry on a broad scale.  Moreover, the continued growth of online competitors and decline in

mall shoppers has consistently challenged the Debtors' ability to right-size their balance sheet

and operate on a sustained profitable basis, resulting in a precipitous drop in EBITDA through

2016.  These collective challenges were amplified by unexpected operational hurdles that arose

from relocation of the corporate headquarters and the transition to a third party distribution

center, the surrounding facts of which are described below.

12.    The market in which the Debtors operate is extremely competitive, as

evidenced by recent chapter 11 filings by, among others, Aeropostale, American Apparel, Pacific

Sunwear of California, Quicksilver, Deb Stores Holding LLC, dELia*s and Body Central Corp.

More recently, once-successful retailers, The Limited and Sports Authority, concluded

liquidations and are presently winding down their affairs.  Indeed, some retailers operating in the

Debtors' space, competing for the same limited market share, have similarly been forced to seek

bankruptcy protection more than once.  Each of these retailers has suffered from some

combination of the same challenges that ultimately compelled the Debtors' liquidation, namely

declining mall traffic, fast-changing trends, expensive commercial leases, and the proliferation of online shopping.

13.     Cognizant of their obligations to various stakeholders, and intent on exhausting all potential avenues to sustained profitability since acquiring their predecessors' business, the Debtors considered all possible strategies geared towards achieving the primary goals of, among other things, renegotiating burdensome leases (or altogether terminating such leases on favorable terms), preserving beneficial trade terms with vendors, and focusing operations to allow the Debtors to retain loyal customers, attracting new customers, and generating steady profits as their business model evolved.  While progress has been made in some areas, the Debtors' financial position remains cash flow negative.  Indeed, the Debtors have consistently generated negative operating cash flow (including prior to the Debtors' acquisition) despite substantial efforts by the Debtors.  Unfortunately, notwithstanding these efforts and the continued support of their lenders, the Debtors' position has not materially improved.

14.     The Debtors did, among other things, consider the costs, benefits and potential pitfalls of pursuing a sale process for all or substantial portion of the Debtors' businesses, but ultimately determined that there was not a sufficient market for their leases, brand and inventory to warrant a further business restructuring through chapter 11 or otherwise. This decision was reached only after it became apparent that the Debtors would not be able to timely obtain additional funding to consummate a successful sale of the Debtors as a going-concern (or find a third party buyer or strategic partner willing to acquire all or a portion of the Debtors on a going concern basis).  Because the Debtors lack adequate liquidity to fund their ongoing operations, the Debtors determined that an orderly liquidation of their assets would

maximize value for all interested parties, while simultaneously allowing the Debtors to solicit interest for their entire asset portfolio.

15.     In furtherance of that process and the decision ultimately reached in the weeks prior to the Petition Date, the Debtors entered into an agreement with a contractual joint venture comprised of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC ("Consultant") on or about February 1, 2017, to conduct the Store Closing Sales at all of their retail locations, and the Store Closing Sales commenced on January 23, 2017.[3]  Prior to starting the Store Closing Sales, the Debtors ceased placing new orders from their vendors and, subsequent thereto, began (or in some cases, continued) advertising pronounced online price reductions on their website and exhausting their ecommerce inventory.  Upon the commencement of these Chapter 11 Cases, the Debtors intend to seek third party purchasers for their other available assets, most notably their intellectual property (the "IP"), and have retained Hilco IP Services LLC (d/b/a Hilco Streambank) ("Streambank"), a nationally-recognized firm that has been retained by similarly-situated retailers facing financial distress, to solicit interest in the IP and conduct a bidding and auction process in connection therewith.  The Debtors believe that there could be significant value generated for the estates through a sale of its customer list and related IP, and that a robust auction process will bring forth viable third party purchasers.

16.     In this context, the Debtors believe that commencing these Chapter 11 Cases will help ensure an orderly liquidation and, as a result thereof, payment of certain claims held against the estates, including administrative and priority claims.  Accordingly, the Debtors submit that the proposed liquidation process presents the best opportunity to maximize value for the Debtors' stakeholders.

---

[3]      The Store Closing Sales contemplate the sale of inventory, furniture, fixtures and equipment located at the Debtors' retail locations, corporate headquarters (as applicable) and Distribution Center (as defined below).

II.    **Business History, Corporate Structure and Prepetition Indebtedness**

A.    *Overview of the Debtors' Business and History*

17.    The "Wet Seal" brand was founded in 1962 as a California beachwear retailer.  Acquired by a Canadian retailer in 1984, the company completed an initial public offering in 1990 and its equity traded on the NASDAQ.  The 1990s saw growth through acquisition of Contempo Casuals, the launch of the Arden B. chain and other acquisitions and new store openings.  Beginning in the early 2000s, the company struggled, disclosing a potential chapter 11 filing in its June 2004 SEC filings.  The company survived and rebounded only to encounter erosion in its performance in 2011 that continued into late 2014, and led The Wet Seal, Inc. and certain related affiliates (collectively, the "Prior Debtors") to commence bankruptcy proceedings before this Court in 2015 and jointly administered through the lead case *In re The Wet Seal, Inc., et al.*, Case No. 15-10081 (CSS) (collectively, the "Prior Chapter 11 Cases").[4]

18.    At the outset of the Prior Chapter 11 Cases, the Prior Debtors rejected over 300 under-performing leases of nonresidential real property, thereby significantly reducing their retail footprint and related rent obligations.  As a result of those efforts and other restructuring initiatives implemented in the early months of the Prior Chapter 11 Cases, the Prior Debtors received multiple bids for their remaining operating assets and, in conjunction therewith, conducted a competitive auction process that ultimately resulted in Wet Seal acquiring substantially all of the Prior Debtors' assets.[5]  Following that process, this Court approved the

---

[4]    The Prior Chapter 11 Cases, which remain open, are currently administered under the caption *In re Seal123, Inc. et al.*

[5]    Certain of the facts set forth in this paragraph are from my review of the *Declaration of Thomas R. Hillebrandt in Support of First Day Motions*, filed at Docket No. 19 in the Prior Chapter 11 Cases.  I also have been advised that the Prior Chapter Cases remain open for purposes of distributing remaining assets by the Court-appointed liquidation trustee.

sale of substantially all of the Prior Debtors' assets to Wet Seal on April 1, 2015 (the "Prior Sale").[6] The terms of the Prior Sale provided, generally, for $7.5 million in cash consideration, the assumption of certain debt and other liabilities, and an immediate $10 million loan to the Prior Debtors to provide the necessary liquidity cushion to fund operations. The Debtors adopted their current corporate and operational structure in connection with the Prior Sale.

19. Upon acquiring the Prior Debtors, the Debtors took immediate steps to refocus their brand on California casual clothing and refashion the Debtors' image in the same light. While rebranding their image, the Debtors also underwent operational and administrative changes in the wake of the Prior Sale, which included, among other things, the appointment of a new CEO, CFO and other senior management personnel.

20. Operationally, the Debtors implemented a fresh pricing strategy to eliminate excess discounts on products, reduced general corporate, administrative and other overhead expenses, and implemented head-count reductions as appropriate after being bought out of bankruptcy. These initiatives were evolved and expanded until very recently, when it became apparent that a chapter 11 filing was unavoidable.

21. The Debtors' total sales in the 12 months ending December 2016 were approximately $144.5 million.

B.    *Prepetition Indebtedness*

22. The Debtors' prepetition debt structure primarily consists of (i) the Crystal Facility (defined below); (ii) the Mador Funding Facility (defined below); and (iii) other unsecured debt consisting of, among other things, employee-related liabilities and trade debt,

---

[6]    Mador Lending, LLC, the DIP lender to the Prior Debtors and the purchaser party to the Asset Purchase Agreement dated March 12, 2015 with the Prior Debtors, designated Wet Seal and WSGC to acquire the Prior Debtors' assets as permitted by that purchase agreement.

including amounts owed to landlords in connection with certain leases of nonresidential real property.

>    I.    *Crystal Facility*

23.    On April 15, 2015, Wet Seal as Borrower and Borrower Representative, and Mador Financing and WSGC, as respective Borrowers (collectively with Wet Seal, the "Borrowers") entered into a four-year, first lien Credit Agreement (as amended from time to time, including most-recently on October 28, 2016, the "Crystal Credit Agreement")[7] with Crystal Financial, LLC ("Crystal" and the underlying facility, the "Crystal Facility"), as Administrative Agent, L/C Issuer and Sole Lead Arranger and Sole Bookrunner, consisting of a $10 million Term Loan Facility (the "Term Loan") and a $5 million Revolving Credit Facility (the "Revolver"). The Term Loan increased to $12 million and the Revolver was reduced to $3 million upon the first anniversary of the Crystal Credit Agreement, April 15, 2016. To provide the Debtors with additional liquidity through the 2016 holiday season, on October 28, 2016 (the "Fourth Amendment Effective Date"), the Term Loan was increased by $3 million to $15 million, while the Revolver commitment remained at $3 million. The Crystal Facility matures on April 15, 2019.

24.    The Revolver proceeds have been historically used for working capital, secure treasury services and for other cash management and general corporate purposes. As of December 1, 2016, $15 million was outstanding under the Term Loan, exclusive of interest and fees.

25.    The Crystal Credit Agreement has been amended or modified six times: February 18, 2016 (amendment); June 3 2016 (limited consent and waiver); June 9, 2016

---

[7]    Capitalized terms used in describing the Crystal Facility but not otherwise defined herein shall have the meanings ascribed to such terms in the Crystal Credit Agreement.

(limited consent); July 6, 2016 (amendment and forbearance); August 31, 2016 (forbearance extension); and October 28, 2016 (amendment).  The amendments and modifications provided for numerous waivers of default and extended relief from various covenants, including most recently on October 28, 2016, to, among other things, address certain defaults thereunder that had occurred, including with respect to the minimum consolidated EBITDA measurement periods and amounts with which the Debtors had failed to comply.  In addition to the increased term loan on the Fourth Amendment Effective Date, Crystal agreed to increase eligible inventory advance rates and eligible in-transit inventory advance rates by 5% through December 30, 2016, to enable the Debtors to operate through the 2016 holiday season.  Notwithstanding the numerous defaults, Crystal continued to forbear and to provide liquidity to the Debtors prior to the Petition Date.

26.    The Term Loan is collateralized by a security interest in favor of Crystal all or substantially all of Debtors' assets.  The Debtors breached the Borrowing Base on or about January 3, 2017, resulting in payment defaults under the Crystal Facility.  Notwithstanding these payment defaults, Crystal provided over-advances to the Debtors to, among other things, help the Debtors meet payroll and certain other critical needs.  The Borrowers also were not able to meet their January interest payment obligations under the Crystal Facility, and did not otherwise comply with certain covenants in the Crystal Credit Agreement given the liquidity constraints described herein that directly compelled the commencement of these Chapter 11 Cases.  Crystal issued that certain Notice of Default and Reservation of Rights, dated as of January 4, 2017, to the Borrowers as a result thereof.  As of January 1, 2017, the Debtors did not have sufficient liquidity to meet their operational needs.

27.    In the weeks leading up to the Petition Date, the Debtors and Crystal collectively considered the Debtors' various restructuring options.  To allow the Debtors sufficient time to prepare for a chapter 11 filing and simultaneously explore all available strategic opportunities, Crystal agreed to fund, among other things, the Debtors' payroll, professionals, rent and certain other critical needs on an over-advance basis notwithstanding the Debtors' default status.  In sum, Crystal funded five (5) over-advance payments during the five weeks preceding the Petition Date as follows: (1) $1,585,607 for the week of January 6, 2017; (2) $681,514 for the week of January 13, 2017; (3) $2,112,838 for the week of January 20, 2017; (4) $3,333,928 for the week of January 27, 2017; and (5) $4,092,795 for the week ending February 3, 2017.

28.    As of the date hereof, Crystal is owed approximately $9,736,833 on account of the Crystal Facility.

## II. *Mador Funding Facility*

29.    On or about July 6, 2016, the Borrowers entered into that certain Second Lien Credit Agreement (as may be amended from time to time, the "Second Lien Credit Agreement") with Mador Funding, LLC ("Mador Funding", and the underlying facility, the "Mador Funding Facility"), as lender and Administrative Agent, consisting of approximately $5.5 million in a term loan facility (the "Second Lien Term Loan") to be used for to fund working capital, capital expenditures and other general corporate purposes of the Debtors, and to fund certain fees and expenses associated with the funding of applicable loans.  The Second Lien Term Loan is collateralized by a second lien security interest in favor of Mador Funding in all or substantially all of the Debtors' assets.

30. Crystal and Mador Funding are parties to that certain Intercreditor and Subordination Agreement, dated as of July 6, 2016, pursuant to which Mador Funding's prepetition secured debt is expressly subordinated to Crystal's secured debt described above.

31. As of the date hereof, Mador Funding is owed approximately $15,600,000 on account of the Mador Funding Facility, plus accreted capitalized and accruing interest and fees.

### III. Other Unsecured Debt

32. As of the Petition Date, the Debtors' books and records reflected accounts payable due and owing in an amount exceeding $8 million on account of unsecured debt, including amounts owed to the Debtors' landlords for past-due rent.

### III. Circumstances Leading to the Commencement of These Chapter 11 Cases and Prepetition Restructuring Efforts

33. As evidenced by the Prior Chapter 11 Cases and disclosures made in connection therewith, the Prior Debtors were not profitable. Although the Debtors have improved their operating performance, the Debtors have yet to achieve profitability since the Prior Sale closed despite their best efforts to right-size their costs and implement sales, rebranding and operational objectives.

34. Prior to the Petition Date, the Debtors began redefining their business model while simultaneously rebranding their fashion line to maintain loyal followers and appeal to new consumers, primarily female shoppers in their late teens and early twenties. These steps included, but were not limited to, (i) marketing cumbersome leases to potential transaction partner; (ii) terminating retail operations at a number of the Debtors' least profitable mall locations; and (iii) outsourcing their distribution needs to a third-party logistics company, National Distributions Center, LLC ("NDC"), that operates and supervises a facility located in

Chino, California.  Indeed, in the month of January, the Debtors terminated their retail activity at

thirty-seven (37) locations, including thirteen (13) "pop-up" stores and twenty-four (24)

permanent stores.  The Debtors also moved their corporate headquarters to a location with less

expensive rent after the Prior Sale closed.  While engaging NDC and relocating their corporate

headquarters generated certain benefits, these moves also triggered operational delays that

contributed to the Debtors' financial underperformance.

35.    At the same time that the Debtors took steps to restructure their lease

portfolio and reduce their significant rental obligations, the Debtor simultaneously solicited

interest from third parties that the Debtors, in consultation with their advisors, determined may

be interested in purchasing substantially all of the Debtors' assets or otherwise engaging in a

restructuring transaction.  The Debtors contacted numerous potential strategic partners to gauge

interest in the Debtors' assets, and solicited feedback from other mall retailers, significant

vendors and the Debtors' largest landlords in an effort to leverage a potential enterprise-saving

transaction.

36.    In conjunction with, and in furtherance of, this process, the Debtors

retained Berkeley Research Group, LLC ("BRG") to serve as their financial advisor during the

ongoing wind down.  BRG has extensive experience in the distressed retail industry and, in

particular, negotiating consulting or agency agreements with liquidators on behalf of retail

companies both in and outside of a court process.  Once it was evident that the Debtors would

have insufficient cash to fund a hypothetical sale process through consummation of a transaction

(whether in or out of court), the Debtors, upon consultation with their secured lenders, decided to

liquidate their assets on an expedited and efficient timeline.  With that objective in mind, the

Debtors retained the Consultant, a joint venture comprised of two nationally recognized

liquidating firms, to assist the Debtors in this endeavor, and the Consultant commenced the Store

Closing Sales on January 23, 2017, at all of the Debtors' retail locations.

37.    On January 20, 2017, the Debtors issued notices under the Worker

Adjustment and Retraining Notification Act ("WARN Act"), and related state statutes, to

employees at the Debtors' corporate headquarters in Irvine, California.  On January 27, 2017,

approximately eighty corporate employees were terminated, together with fourteen field

leadership employees, in an effort to reduce headcount in light of the Debtors' go-forward

operational needs.  As inventory at the Debtors' retail stores is liquidated and the Debtors cease

operating certain locations, the Debtors will reevaluate their employee needs on a rolling basis.

38.    In light of the Debtors' lack of liquidity, the dearth of potential going-

concern buyers, and the ongoing Store Closing Sales, I believe that the Debtors have exhausted

their going-concern alternatives at this time and that the orderly wind down of the Debtors'

operations, subject to Court supervision, represents the best means through which to maximize

value for the estates and all parties interested therein.

## IV.    Objectives for Chapter 11 and Proposed Initiatives

39.    For the reasons outlined above, the Debtors believe that the

commencement of these Chapter 11 Cases is a necessary and prudent measure to maximize the

value of the Debtors' estates.  At the outset of these proceedings, the Debtors will seek approval

to continue to conduct the Store Closing Sales and maximize value therefrom.  The Debtors will

also take—and in some instances already have taken—a number of steps to reduce their go-

forward expenses, such as filing appropriate contract and lease rejection motions as the Store

Closing Sales run their course, pursuant to which the Debtors will seek to reject a number of

burdensome store leases and contracts that the Debtors and their advisors have determined are

unlikely to be assumed and assigned and will, in the near term, be no longer be necessary to the Debtors' operations.[8]

40.    The Debtors implemented, and will continue to consider, a series of processes to liquidate other assets as efficiently as possible, including *de minimis* assets and marketable leasehold interests that potentially hold value for the estates.  Moreover, the Debtors have retained Streambank to market their IP and are soliciting interest therein; in furtherance thereof, the Debtors intend to implement a competitive bidding and auction process in the early months of these Chapter 11 Cases.  The Debtors will continue to analyze their asset portfolio and available disposition alternatives with respect to all available assets as the Store Closing Sales unfold and the Chapter 11 Cases adopt a concerted path.

## V.    First-Day Motions

41.    As a result of my first-hand knowledge, and through my review of various materials and information, discussions with members of the Debtors' management and the Debtors' outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtors in the First Day Motions, (b) the need for the Debtors to continue to operate effectively while winding down their operations and implementing an orderly liquidation, (c) the deleterious effects upon the Debtors of not obtaining the relief sought in the First Day Motions, and (d) the immediate and irreparable harm to which the Debtors will be exposed upon the commencement of these Chapter 11 Cases unless the relief requested in the First Day Motions is granted without further delay.

---

[8]    On the date hereof, the Debtors filed the *Debtors' First (1st) Omnibus Motion for Entry of an Order, Pursuant to Sections 105(a), 365(a), and 554(a) of the Bankruptcy Code, Authorizing the Debtors to Reject Certain Unexpired Leases of Nonresidential Real Property, Nunc Pro Tunc to the Petition Date*, pursuant to which the Debtors seek to reject, effective as of the Petition Date, all nonresidential real property leases for which subject premises were surrendered in January 2017, including certain leases, out of an abundance of caution, that expired by their own terms prior to the commencement of these Chapter 11 Cases.

42.    I submit this Declaration in support of the Debtors' chapter 11 petitions and First Day Motions.  I or members of the Debtors' management team participated in preparing and/or have reviewed each First Day Motion (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe the facts set forth therein are true and correct.  Such representation is based upon information and belief and through my review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition, and information provided to me by the Debtors' management team or advisors on which I reasonably relied.  If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each First Day Motion and this Declaration.

43.    I believe, on behalf of the Debtors, that the relief sought in the First Day Motions will minimize the adverse effects of these Chapter 11 Cases on the Debtors, their employees and their creditors, and help ensure that the value of the Debtors' assets is maximized for the benefit of all interested parties.  As described more fully below, the relief requested in the First Day Motions was carefully tailored by the Debtors, in consultation with their professionals, to ensure that the Debtors' immediate operational needs are met so as to allow the Store Closing Sales to succeed, and that the Debtors suffer no immediate and irreparable harm during the wind down process.  I, or my colleagues at my instruction, participated in the analysis that informed each First Day Motion, and assisted in developing the relief requested therein and reviewing pleadings related thereto.  At all times, the Debtors' management and professionals remained cognizant of the limitations imposed on a debtor-in-possession and, in light of those limitations, the Debtors narrowed the relief requested at the outset of these Chapter 11 Cases to those matters

that require urgent relief to sustain the Debtors' immediate operations and preserve value during the pendency of these Chapter 11 Cases.

A.      *Claims Agent Retention Application*

44.      The Debtors request entry of an order, pursuant to 28 U.S.C. § 156(c) and Rule 2002-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), authorizing the retention and appointment of Donlin, Recano & Company, Inc. ("<u>DRC</u>") as claims and noticing agent in these Chapter 11 Cases.  DRC served as claims and noticing agent to the Prior Debtors, and I believe that the synergies between the instant cases and the Prior Chapter 11 Cases, together with DRC's competitive rates, warrant DRC's appointment as claims and noticing agent in these Chapter 11 Cases.  I believe that the relief requested in the DRC retention application will ease the administrative burden on the Clerk of the Court in connection with these Chapter 11 Cases.  In addition, I have been advised by the Debtors' proposed counsel that DRC's retention is required by the Local Rules in light of the Debtors' anticipated number of creditors.

45.      Therefore, the Debtors respectfully request that DRC's retention application be approved.

B.      *Utilities Motion*

46.      By this motion (the "<u>Utility Motion</u>"), and to ensure continued provision of utility services (the "<u>Utility Services</u>") to each of the Debtors' retail locations and their corporate headquarters, the Debtors seek entry of interim and final orders (i) prohibiting the Debtors' utility service providers (collectively, the "<u>Utility Service Providers</u>") from altering, refusing, or discontinuing utility service on account of unpaid prepetition invoices, (ii) deeming the Utility Service Providers to be adequately assured of future payment, and (iii) establishing

procedures for determining additional adequate assurance of future payment and authorizing the

Debtors to provide adequate assurance of future payment to the Utility Service Providers.  The

Debtors propose establishing a segregated account into which the Debtors will deposit a sum

equal to approximately 50% of the Debtors' estimated aggregate monthly utility expenses and,

additionally, have proposed procedures to address any request made by the Utility Service

Providers for additional adequate assurance.

47.      Any disruption of the Debtors' Utility Services would cause irreparable

harm to the Debtors' business operations, their estates and the success of the Store Closing Sales.

The successful consummation of the Store Closing Sales and the sales of any other assets (as

applicable) require that the Utility Services be provided on a continual and uninterrupted basis

while the Debtors remain in their retail locations and operating from their corporate

headquarters.  Any disruption of the Utility Services could have a significant impact on the

Debtors' business operations and efforts to maximize value for the estates.  As the Store Closing

Sales conclude, the Debtors will take immediate action to minimize postpetition expenses,

including with respect to utility services that will no longer be necessary upon exiting the

Debtors' retail locations.

48.      For the foregoing reasons, the Debtors submit, and I believe, that the relief

requested in the Utility Motion is in the best interest of the Debtors, their estates and their

creditors, and should therefore be approved.

C.      *Cash Management Motion*

49.      By this motion (the "Cash Management Motion"), the Debtors seek entry

of an order, among other things, (i) authorizing continued use of their existing (a) bank accounts,

(b) cash management system, and (c) checks and business forms, and (ii) waiving the

requirements of section 345(b) of the Bankruptcy Code in connection therewith on an interim

basis.  In addition, the Debtors also request a waiver of certain of the operating guidelines

established by the Office of the United States Trustee for the District of Delaware that require the

Debtors to close all prepetition bank accounts, open new accounts designated as debtor-in-

possession accounts, and provide new business forms and stationery.

50.    As described in detail in the Cash Management Motion, the Debtors

maintain a cash management and disbursement system in the ordinary course of their operations

(the "Cash Management System").  To lessen the disruption caused by the bankruptcy filing and

maximize the value of their estates in these Chapter 11 Cases, it is vital that the Debtors maintain

their Cash Management System and be authorized to, *inter alia*, pay any outstanding fees owed

in relation to their bank accounts.

51.    The Debtors maintain current and accurate accounting records of daily

transactions and submit that maintaining this Cash Management System will prevent undue

disruption to the Debtors' operations while protecting the Debtors' cash for the benefit of their

estates.  It is critical that the Debtors be able to consolidate management of cash and centrally

coordinate transfers of funds to efficiently and effectively operate their business operations.

Absent obtaining the relief requested in the Cash Management System, the Debtors will not be

able to maximize value through the Store Closing Sales and their other wind down efforts.

52.    Accordingly, the Debtors request that the relief requested in the Cash

Management Motion be approved.

D.    *Insurance Motion*

53.    By this motion (the "Insurance Motion"), the Debtors request the entry of

an order (i) authorizing, but not directing, the Debtors to (a) continue and, to the extent

necessary, renew or perform under renewed or renew the insurance programs (collectively, the "Insurance Programs") summarized in the Insurance Motion, (b) pay, in their sole discretion, all undisputed policy premiums, claims, deductibles, retentions, administrative fees, broker fees and other obligations relating to the Insurance Programs (such obligations, the "Insurance Obligations") that were or are due and payable, and relate to the period before or after the Petition Date, and (c) continue the Financed Programs (as defined below) and enter into new premium financing programs, as appropriate in the Debtors' business judgment, and (ii) authorizing the Debtors' banks (collectively, the "Banks") to honor and process check and electronic transfer requests related thereto.

54.    In the ordinary course of business, the Debtors have maintained, and continue to maintain, a number of insurance policies for, among other things, (a) crime, (b) fiduciary liability, (c) employment practices liability, (d) automobile, (e) cyber liability, and (f) umbrella.  The Debtors employ Marsh Risk & Insurance Services (the "Broker") to assist them with the procurement and negotiation of its Insurance Programs.

55.    I believe that maintaining the Debtors' insurance coverage under the Insurance Programs is a crucial ordinary-course-of-business transaction, and necessary to preserve value during the Debtors' wind down.  Authority to pay any prepetition Insurance Obligations—to the extent that the Debtors determine that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment of the coverage, benefits or proceeds provided under the Insurance Programs—is imperative, as the insurance coverage provided under the Insurance Programs is essential for preserving the value of the Debtors' assets, and, in most cases, such coverage is required by the various contracts and laws that govern the Debtors' operations.  Furthermore, it is my understanding that, under the

chapter 11 operating guidelines issued by the United States Trustee for Region 3 pursuant to 28 U.S.C. § 586, the Debtors are obligated to maintain certain insurance coverage during these Chapter 11 Cases, and such coverage is provided by certain of the policies included in the Insurance Programs.

56.     Because it is not economically advantageous for the Debtors to pay the premiums on each of their Insurance Programs on an annual basis, from time to time and in the ordinary course of business, the premiums on the Insurance Programs are financed (such programs, the "Financed Programs") pursuant to a premium finance agreement (the "PFA") between the Debtors and AFCO Acceptance Corporation ("AFCO"). If the Debtors are unable to continue making payments under the PFA, AFCO may be permitted to terminate the Financed Programs, at which point the Debtors would be required to obtain replacement insurance on an expedited basis and likely at a significantly increased cost. Given the importance of maintaining insurance coverage under the Financed Programs during the Debtors' ongoing wind down, and preserving the Debtors' limited liquidity by financing insurance premiums, I believe that it is in the best interest of the Debtors' estates and creditors that the Debtors be authorized to continue their historic practice of paying amounts due under the PFA as they come due.

57.     Accordingly, for the reasons set forth herein and in the Insurance Motion, the Debtors respectfully request that the relief requested in the Insurance Motion be approved.

E.      *Wages Motion*[9]

58.     Pursuant to this motion (the "Wages Motion"), the Debtors request entry of an order (a) authorizing, but not directing, the Debtors, in accordance with their stated policies and in their discretion, to, among other things, (i) pay prepetition employee wages, salaries and

---

[9]     Capitalized terms used in this Section V(E) but not otherwise defined herein shall have the meanings ascribed to such terms in the Wages Motion.

other accrued compensation, (ii) reimburse prepetition employee business expenses, (iii) make contributions to prepetition benefit programs and continue such programs in the ordinary course of business, (iv) honor workers' compensation obligations, as applicable, (v) make payments for which prepetition payroll deductions were made, (vi) pay processing costs and administrative expenses relating to the foregoing payments and contributions, and (vii) make payments to third parties incident to the foregoing payments and contributions, and (b) authorizing the Banks to honor and process check and electronic transfer requests related to the foregoing.

59.     As of the Petition Date, the Debtors employ approximately 366 hourly Full-Time Employees, 33 salaried Full-Time Employees, for a total of 399 Full-Time Employees, and 1,357 Part-Time Employees.  This calculation reflects the terminations effected on January 27, 2017, with respect to approximately eighty corporate employees based at the Debtors' corporate headquarters and fourteen field leadership employees.  Although the Debtors have paid their wage, salary, and other obligations in accordance with their ordinary compensation schedule prior to the Petition Date, as of the date hereof, certain prepetition obligations for remaining Employees may nevertheless be due and owing.

60.     Many of the Debtors' Employees rely on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses.  Consequently, these Employees will be exposed to significant financial hardship if the Debtors are not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses.  Moreover, if the Debtors are unable to satisfy such obligations, Employee morale and loyalty will be jeopardized at a time when Employee support is critical to the Debtors and the success of the Debtors' wind down efforts.  Given the ongoing Store Closing Sales, many Employees have already started seeking alternative employment, and in the absence of the payments

contemplated by the Wages Motion, the Debtors' immediate wind down efforts will be further

hindered and the Store Closing Sales and the Debtors' other disposition efforts will not generate

maximum proceeds.  If Employees are inclined to find alternative employment, the Debtors

would need to replace such employees to conduct the Store Closing Sales and the Debtors' other

remaining business, at a substantial cost to the Debtors.

61.     I believe that the relief requested in the Wages Motion is in the best

interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable

the Debtors to continue to operate their business in chapter 11 without disruption to conduct an

orderly liquidation of their assets.  Accordingly, the Debtors respectfully request that the relief

set forth in the Wages Motion be approved.

F.     *Taxes Motion*

62.     By this motion (the "Taxes Motion"), the Debtors request entry of an

order (i) authorizing, but not directing, the Debtors, in their discretion, to remit certain taxes

including sales, use, franchise, commercial activity, business and occupation, and various other

taxes, fees, charges, and assessments (collectively, the "Taxes and Fees") that the Debtors

incurred prepetition that are or will become due and payable to various federal, state and local

taxing authorities and other governmental authorities (each, an "Authority," and collectively, the

"Authorities") in connection with the sale of their products or services at store locations, or

through shipments of products purchased through the Debtors' website to customers, and

(ii) authorizing the Banks to honor and process check and electronic transfer requests related to

the foregoing.

63.     The Taxes and Fees are paid monthly, quarterly, semi-annually or

annually to the respective Taxing Authorities, depending on the given Tax or Fee and the

relevant Taxing Authority to which it is paid.  As of the Petition Date, the Debtors estimate that

they owe approximately $525,000—and no more than $600,000—in unremitted Taxes and Fees,

which are comprised entirely of current tax obligations, and are not in respect of "catch-up"

payments.  Furthermore, the Debtors estimate that approximately $525,000 in Taxes and Fees

will come due in the first twenty-one days following the Petition Date, and seek authority to

meet these obligations on an interim basis.

    64.    Any regulatory dispute or delinquency that impacts the Debtors' ability to

conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the

Debtors' ability to maximize proceeds generated by the Store Closing Sales.  Moreover, some of

the Authorities may initiate an audit of the Debtors if the Taxes and Fees are not paid on time.

Such audits will unnecessarily divert the Debtors' attention away from these Chapter 11 Cases

and result in unnecessary expenses.  Moreover, if the Debtors do not pay such amounts in a

timely manner, the Authorities may attempt to suspend the Debtors' operations, file liens, seek to

lift the automatic stay, seek payment from the Debtors' managers and officers, or pursue other

remedies that will materially and immediately harm the estates.

    65.    I believe that the Debtors' failure to pay the Taxes and Fees could have a

material adverse impact on the Debtors' ability to maximize the value of their assets for the

benefit of all stakeholders.  Additionally, any attempt to collect the Taxes and Fees from the

Debtors' members and officers has the potential to divert the attention of those individuals away

from the Debtors' wind-down initiatives.

    66.    Accordingly, for the reasons set forth herein and in the Taxes Motion, The

Debtors respectfully request that the Taxes Motion be approved.

G.      *Shippers and Warehousemen Motion*

67.      By this motion (the "Shippers Motion"), the Debtors request entry of an

order authorizing, but not directing, the Debtors to pay, in the ordinary course of business, claims

held by certain of the debtors' shippers, freight forwarders and warehousemen in possession of

the Debtors' goods as of the Petition Date.  The success of the Store Closing Sales depends on

the Debtors' ability to stock the Debtors' stores and ship goods to and from their distribution

center.  To ensure the steady movement of products, the Debtors rely on a network of shippers

and freight forwarders that process and ship the Debtors' merchandise (the "Merchandise") to

and from the Debtors' third party distribution center (the "Distribution Center") and, ultimately,

to their retail stores.  If the Debtors fail to pay any of the foregoing entities for charges incurred

in connection with the transportation of the Merchandise, various statutes, tariffs and agreements

permit the shipper, freight forwarders and warehousemen to assert possessory liens against the

Merchandise in their possession.  Simply stated, if the stores do not receive the inventory located

at the Distribution Center, the Store Closing Sales will be a resounding failure.

68.      As of the Petition Date, the Debtors estimate that approximately $650,000

is owed on account of claims for which amounts will come due on or before twenty-days from

the date hereof for shipping, freight forwarding, and customs duties (the "Transporter Claims"),

inclusive of small claims held by NDC arising from prepetition services that will be invoiced to

the Debtors postpetition.  Payment of the foregoing Transporter Claims will avoid disruption in

the Debtors' business, prevent the possibility of possessory liens being asserted against the

Debtors' Merchandise, and enable the Debtors to realize maximum value of the Merchandise

through the Store Closing Sales.  I further believe that immediate authorization to satisfy the

Transporter Claims will avoid the immediate and irreparable harm that would be thrust upon the

estates if such claims were not paid because it will ensure that the Transporters will continue to

provide vital services during the duration of the Store Closing Sales.

69.      Because payment of the prepetition Transporter Claims is imperative to

the Debtors' ability to maximize the value of their estates for the benefit of their creditors, the

Debtors respectfully request that the relief requested in the Shippers Motion be approved.

H.      *Consulting Agreement Assumption Motion*

70.      By this motion (the "Consulting Agreement Assumption Motion"), the

Debtors request authority to assume the consulting agreement entered into by and between the

Debtors and the Consultant and continue the Store Closing Sales.  In early January 2017, after

determining that going-concern alternatives were not feasible due to market limitations and

liquidity constraints, the Debtors' advisors began contacting certain nationally-recognized

potential liquidators, each of which is well-suited to effectuate a transaction of the magnitude

contemplated, to solicit interest in bidding on the right to conduct the Store Closing Sales.  The

Debtors discussed the proposed commencement, scope and duration of the Store Closing Sales

with such nationally-recognized firms and solicited bids therefrom.

71.      After extensive negotiations, and with the assistance of BRG and the

Debtors' proposed counsel, the Debtors selected the Consultant to conduct the Store Closing

Sales, in accordance with the Consulting Agreement dated as of February 1, 2017 (the

"Consulting Agreement").  The Store Closing Sales commenced at all of the Debtors' retail

locations on or about January 23, 2017, and the Debtors simultaneously began exhausting their

ecommerce inventory presently stored at the Distribution Center through offered discounts and

promotions on their website.  Following the Petition Date, the Debtors seek to assume the

Consulting Agreement and allow the Consultant to continue supervising and implementing the

Store Closing Sales. The Debtors submit that assumption of the Consulting Agreement and the ability to continue with the Store Closing Sales, without interruption, is necessary to preserve the value of the Debtors' estates and avoid irreparable harm.

72.     Pursuant to the Consulting Agreement, the Consultant will, among other things, provide qualified supervisors to oversee and conduct the Store Closing Sales at the Debtors' retail locations, negotiate directly with landlords and other constituents as needed, advise the Debtors regarding effective advertising, pricing and related clearance strategies, and recommend loss prevention programs designed to protect against inventory shrink. In addition, the Consultant will advise the Debtors regarding the consolidation of inventory prior to the conclusion of the Closing Store Sales in a manner that will minimize administrative expenses and reduce the Debtors postpetition rent payment obligations. In exchange for obtaining the Consultant's services, the Debtors have agreed to, among other things, satisfy related sale expenses and pay the Consultant a Consulting Fee driven by gross recovery on available inventory. A fee schedule setting forth the agreement reached by and between the Debtors and the Consultant is set forth in Section 3.2 of the Consulting Agreement. Finally, the Consultant will receive 20% of gross receipts (net of applicable sales taxes and expenses) obtained from the sale of FF&E owned by the Debtors and located at the Debtors' stores, Distribution Center and corporate headquarters. Subject to further agreement between the parties, the Store Closing Sales are slated to conclude by February 28, 2017.

73.     As further detailed in the Consultant Agreement Assumption Motion, the Debtors intend to honor all gift cards through the conclusion of the Store Closing Sales, but have ceased selling gift cards on their website and at their store locations. All other customer

programs that were in place prior to the Petition Date have been terminated consistent with the terms and conditions thereof.

74.     I believe that the Debtors' decision to conduct Store Closing Sales represents the best path for maximizing recoveries to the Debtors' estates with respect to Debtors' remaining assets.  To that end, I believe that engaging the Consultant pursuant to the Consulting Agreement will achieve the maximum value for the Debtors' Merchandise and minimize the administrative expenses to be borne by the Debtors' estates by, among other things, positioning the Debtors to exit their retail locations by the end of February 2017.  In particular, the Consultant's extensive expertise in conducting liquidation sales generally will allow it to oversee and implement the Store Closing Sales, with the assistance of the Debtors' management, in the most efficient and cost effective manner.  Accordingly, I believe that entry into the Consultant Agreement, which will enable the Debtors to utilize the experience, skills, and resources of the Consultant, together with the uninterrupted continuation of the Store Closing Sales, will generate maximum return for the estates and all interested parties.  By contrast, I believe that delaying the further conduct of the Store Closing Sales would result in an increase in burdensome and unnecessary administrative expenses, to the prejudice of all interested parties.

75.     With respect to the proposed fee structure, upon further discussions with BRG and the Debtors' other outside advisors, I believe that the fees set forth in the Consulting Agreement are market-based, derived from a competitive marketing process, and consistent with fee structures that have been approved by courts in connection with similar agreements. Moreover, the Debtors, in consultation with their advisors, formulated the applicable sale guidelines to allow the Debtors to conduct the Store Closing Sales in a manner that maximizes value for the estates.

01:21505177.1

76.     Because the relief sought in the Consulting Agreement Assumption Motion is imperative to the Debtors' ability to maximize the value of their estates for the benefit of their creditors through the Store Closing Sales, and for the other reasons set forth above, the Debtors respectfully request that the Consultant Agreement Assumption Motion be approved.

I.      *Cash Collateral Motion*

77.     In the weeks preceding the Petition Date, the Debtors engaged in extensive negotiations with Crystal regarding, among other things, restructuring alternatives, funding needs and, ultimately, the Debtors' adopted liquidation strategy.  In connection therewith, the Debtors and Crystal entered into a cash collateral stipulation pursuant to which the Debtors have obtained the consensual use of cash collateral on a postpetition basis.  I believe that the terms on which the Debtors and Crystal ultimately settled, as more fully described in the motion seeking authority to use cash collateral filed contemporaneously herewith (the "Cash Collateral Motion"), represent the most favorable terms that the Debtors reasonably could have achieved under the circumstances.  To implement the consensual use of cash collateral ("Cash Collateral"), the Debtors request entry of an order (a) authorizing the Debtors to use cash collateral; (b) granting adequate protection to Crystal; (c) modifying the automatic stay, to the extent applicable and as set forth in the Cash Collateral Motion; and (d) granting certain related relief.

78.     I believe that the Debtors have an immediate need to use Cash Collateral, without which the Debtors cannot, among other things, operate their retail locations, conduct the Store Closing Sales, or fund their payroll.  Otherwise stated, access to Cash Collateral is a critical component of the Debtors' wind down strategy.  Cash Collateral, used on a consensual

basis, will give the Debtors sufficient liquidity to administer these cases and implement the value-maximizing processes described herein.

79.     Upon discussions with the Debtors' advisors, and my understanding of the agreement reached with Crystal regarding use of Cash Collateral, I believe that the terms and conditions required by Crystal to permit the use of Cash Collateral on a consensual basis are acceptable and necessary given the Debtors' liquidity needs during these Chapter 11 Cases.  I have carefully reviewed the proposed budget and the covenants and other conditions related thereto, and I believe, on behalf of the Debtors, that it provides the Debtors sufficient flexibility to operate their business in a value-maximizing manner during these Chapter 11 Cases.  I believe that the payments to Crystal contemplated by the proposed interim order approving the Cash Collateral Motion are reasonable and in the best interests of the estates because, among other things, they will reduce the amount of prepetition debt owed to the Debtors' secured lenders (which is accruing interest at the default rate), the payments will be made from the proceeds of Crystal's collateral, and any payments will be subject to the reservation of rights in paragraph 17 of such order.

80.     For the foregoing reasons, and those set forth in the Cash Collateral Motion, the Debtors respectfully request that the Cash Collateral Motion be granted.

## VI.    Conclusion

81.    In conclusion, for the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of these Chapter 11 Cases, the Debtors respectfully request that each First Day Motion be granted in its entirety, together with such other and further relief as the Court deems just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  February  2, 2017
Irvine, California

/s/ Judd P. Tirnauer
Judd P. Tirnauer
Executive Vice President &
Chief Financial Officer
The Wet Seal, LLC

# EXHIBIT A

**Corporate Organization Chart**

01:21505177.1

